NO. COA14-551

NORTH CAROLINA COURT OF APPEALS

Filed: 16 December 2014

KEITH TEDDER,
        Employee, Plaintiff,

        v.                               North Carolina
                                         Industrial Commission
                                         I.C. No. X41641
A&K ENTERPRISES,
        Employer,

and

PROTECTIVE INSURANCE COMPANY,
        Carrier, Defendants.


        Appeal by defendants from opinion and award entered 10
March 2014 by the North Carolina Industrial Commission.   Heard
in the Court of Appeals 6 October 2014.


        *Goodman McGuffey Lindsey & Johnson, LLP, by Michael A.
        Cannon, for defendants-appellants.*

        *David Gantt Law Office, by David Gantt, for plaintiff-
        appellee.*


        DIETZ, Judge.


        This workers' compensation case concerns the proper method
of calculating average weekly wages for temporary employees.
After two years of unemployment and a few months in a low-paying
seasonal job, Plaintiff Keith Tedder began a seven-week

temporary position with Defendant A&K Enterprises that paid $625 per week.

Unfortunately, Tedder injured his back after the first week in this temporary position and could not continue working. He then applied for workers' compensation benefits. In awarding benefits, the Industrial Commission calculated Tedder's average weekly wage at $625, despite finding that Tedder was a temporary employee, that he could not expect to earn that wage full time, and that the $625 calculation was "unfair" to A&K.

The Commission's calculation cannot be sustained. The purpose of the average weekly wage calculation is to approximate what the employee would be earning were it not for the injury, not to provide an earnings safety net for the chronically unemployed or underemployed.

Consistent with this statutory purpose, we hold that in calculating average weekly wages for employees in temporary positions, the Commission must take into account the number of weeks the employee would have been employed in that temporary position relative to a 52-week time period. Here, the short duration of Tedder's temporary employment must result in an average weekly wage that is substantially less than $625. Accordingly, although we affirm the Commission's conclusion that

Tedder is eligible for temporary total disability compensation, we reverse the Commission's average weekly wage determination and remand for a new determination consistent with this opinion.

**Factual Background**

**I. Tedder's Employment History**

Keith Tedder is a 48-year-old single father whose work experience consists entirely of heavy lifting and driving trucks. Over the years, Tedder has worked as a delivery driver for a number of different companies, loading and unloading items weighing up to 150 pounds. In June 2004, while delivering packages for an employer in Asheville, Tedder injured his back. He later settled his workers' compensation claim with that employer.

To alleviate the pain resulting from his 2004 injury, Tedder underwent a right L4-5 laminectomy and discectomy on 7 November 2005. Dr. Michael Goebel, who performed the surgery, noted that Tedder experienced a surprising recovery. On 14 February 2006, Dr. Goebel found that Tedder had reached maximum medical improvement and assigned a 10% permanent partial impairment rating to his back. He released Tedder to medium-duty work, placing permanent restrictions on lifting more than fifty pounds, as well as limitations on bending, stooping,

twisting, squatting, crouching, and prolonged sitting or standing.

After his release from Dr. Goebel's care in April 2006, Tedder did not find a job until March 2007, when he began working for Carolina Mulch as a delivery driver. He worked that job for eighteen months before being laid off in September 2008. While at Carolina Mulch, Tedder was able to perform all the duties of a delivery driver, including loading and unloading very heavy items without difficulty. He regularly exceeded Dr. Goebel's permanent restrictions without incident. Although he occasionally experienced a sore back when he worked overtime, Tedder did not seek any medical assistance for his back while working for Carolina Mulch.

After being laid off from Carolina Mulch in September 2008, Tedder was unemployed for more than two years. In November 2010, Tedder accepted a position with Volt Management Corporation, a temporary staffing agency that contracted with Federal Express to provide extra delivery drivers during the press of the holiday season. Tedder worked approximately eight to ten hours per day, two days per week for Volt, earning at most $260 per week. Tedder did not seek any medical treatment for his back during his employment with Volt.

## II.  Tedder's Job at A&K

In February 2011, as Tedder's seasonal work at Volt drew to a close, Defendant A&K Enterprises asked Volt for recommendations to fill an open position for a temporary delivery driver.  A&K is a small "mom-and-pop" delivery company and subcontractor for Federal Express.  The company hires temporary employees during the peak holiday season and also on an as-needed basis.  A&K was searching for a temporary employee to fill in for one of its full-time delivery drivers who was scheduled to undergo surgery.  A&K anticipated that the full-time employee would be absent for seven weeks on medical leave.

Volt referred Tedder to A&K, and A&K ultimately hired Tedder as a temporary driver working five days per week for $625 per week.  The Full Commission expressly found that Tedder was "a temporary employee hired to work for a limited time period of seven weeks."

## III. Tedder's Injury and Ongoing Treatment

On 8 March 2011, just one week after beginning his temporary employment with A&K, Tedder felt a sharp pain in his lower back while bending over to pick up a package.  He was able to complete the remainder of his shift, but the route took him twice as long due to intense pain in his lower back.  The next

day, Tedder called to inform the owners of A&K that he was unable to work due to the pain he was experiencing. A&K hired another temporary worker to cover the remainder of its full-time employee's seven-week medical leave.

Following his 8 March 2011 injury, Tedder sought care from a number of medical professionals to address the pain in his back. Despite this ongoing care, however, Tedder continued to experience sharp pain in his lower back, as well as pain and numbness in his left buttock, leg, and foot. He scheduled an appointment at the Carolina Spine & Neurosurgery Center in early 2012, where he was examined by Dr. John Silver. Dr. Silver, a board certified neurosurgeon, determined that the 8 March 2011 accident exacerbated Tedder's pre-existing back condition. He recommended that Tedder undergo a Functional Capacity Evaluation to determine his physical limitations. Dr. Silver referred Tedder for an epidural injection and for additional evaluation with Dr. Margaret Burke.

Before beginning treatment with Dr. Burke, Tedder underwent an independent medical evaluation (at Defendants' request) with Dr. Richard Broadhurst, an expert in occupational and environmental medicine. Dr. Broadhurst recommended that until he receive further treatment, Tedder could return to work at the

sedentary level with a ten pound maximum lifting restriction, along with significant limitations on movement.

Tedder began treatment under the care of Dr. Burke, a physiatrist, on 29 March 2012. Dr. Burke diagnosed Tedder with chronic left L5 radiculopathy and prescribed a course of physical therapy. In her deposition testimony, Dr. Burke stated that Tedder's condition was not purely degenerative in nature, and that the 8 March 2011 accident exacerbated Tedder's pre-existing back condition. Tedder has continued treatment with Dr. Burke, who is his ongoing pain management physician. As of the date of her post-hearing deposition conducted 14 January 2013, Dr. Burke had not released Tedder at maximum medical improvement.

Since his injury in March 2011, Tedder has not returned to employment with A&K or any other employer. Tedder filed for workers' compensation benefits on 2 May 2011. A&K and its insurer denied the compensability of the claim. Deputy Commissioner Myra L. Griffin granted Tedder's claim in an opinion and award filed 15 April 2013, determining that he was entitled to temporary total disability compensation and calculating his statutory average weekly wages at $625 per week. Defendants timely appealed to the Full Commission.

The Full Commission, in a unanimous decision by Commissioners Pamela T. Young, Bernadine Ballance, and Danny Lee McDonald, affirmed the deputy commissioner's award on 10 March 2014. Defendants timely appealed to this Court.

**Analysis**

Our review of a decision of the Industrial Commission "is limited to determining whether there is any competent evidence to support the findings of fact, and whether the findings of fact justify the conclusions of law." *Cross v. Blue Cross/Blue Shield*, 104 N.C. App. 284, 285-86, 409 S.E.2d 103, 104 (1991). The findings of the Commission are conclusive on appeal where competent evidence exists, "even if there is plenary evidence for contrary findings." *Hardin v. Motor Panels, Inc.*, 136 N.C. App. 351, 353, 524 S.E.2d 368, 371 (2000). We review the Full Commission's conclusions of law *de novo*. *Conyers v. New Hanover Cnty. Sch.*, 188 N.C. App. 253, 255, 654 S.E.2d 745, 748 (2008).

**I. Computation of Tedder's Average Weekly Wages**

Defendants first challenge the Commission's computation of Tedder's average weekly wages. "The determination of the plaintiff's 'average weekly wages' requires application of the definition set forth in the Workers' Compensation Act, and the case law construing that statute[,] and thus raises an issue of

law, not fact." *Boney v. Winn Dixie, Inc.*, 163 N.C. App. 330, 331-32, 593 S.E.2d 93, 95 (2004) (citation and internal quotation marks omitted). We therefore review the Commission's calculation of Tedder's average weekly wages *de novo*. *Id.*

Average weekly wages are determined by calculating the amount the injured worker would be earning but for his injury. *Loch v. Entm't Partners*, 148 N.C. App. 106, 111, 557 S.E.2d 182, 185 (2001). The calculation is governed by N.C. Gen. Stat. § 97-2(5), which sets out five distinct methods for calculating an injured employee's average weekly wages. *Conyers*, 188 N.C. App. at 255, 654 S.E.2d at 748. The five methods are ranked in order of preference, and each subsequent method can be applied only if the previous methods are inappropriate. *Id.* Methods 1, 3, and 5 are relevant in this case:

> [Method 1] "Average weekly wages" shall mean the earnings of the injured employee in the employment in which the employee was working at the time of the injury during the period of 52 weeks immediately preceding the date of the injury, . . . divided by 52 . . . .
>
> . . . .
>
> [Method 3] Where the employment prior to the injury extended over a period of fewer than 52 weeks, the method of dividing the earnings during that period by the number of weeks and parts thereof during which the employee earned wages shall be followed;

provided, results fair and just to both parties will be thereby obtained.

. . . .

[Method 5] But where for exceptional reasons the foregoing would be unfair, either to the employer or employee, such other method of computing average weekly wages may be resorted to as will most nearly approximate the amount which the injured employee would be earning were it not for the injury.

N.C. Gen. Stat. § 97-2(5) (2013).[1]

Under this statutory hierarchy, when an employee has worked at his job continuously for the preceding 52 weeks, average weekly wages must be calculated under Method 1 by simply dividing the total earnings during that 52-week period by 52. The Commission found, and we agree, that this method is inappropriate because Tedder only worked at A&K for one week, nowhere near the 52 weeks necessary to use Method 1.

Method 3 can be used when the employee was on the job less than 52 weeks. Under Method 3, average weekly wages are calculated by dividing the total earnings on the job by the number of weeks (or portions of weeks) the employee worked. Under Method 3, Tedder's average weekly wage is $625, a figure

---

[1] The Commission determined, and the parties concede, that Methods 2 and 4 are inapplicable to the factual circumstances of this case, and therefore we need not address those methods in this opinion.

obtained by dividing his total earnings, $625, by the total number of weeks worked, one. But Method 3 can be used only if "results fair and just to both parties will be thereby obtained." N.C. Gen. Stat. § 97-2(5). Here, the Commission found as fact that Tedder was "a temporary employee hired to work for a limited time period of seven weeks." Based on this finding, the Commission determined, and we agree, that Method 3 is inappropriate because the result "would be unfair . . . due to the temporary nature of the employment relationship shared by defendant-employer and plaintiff."

Having determined that Methods 1 and 3 were inappropriate (and that Methods 2 and 4 were inapplicable), the Commission resorted to Method 5. This "catch-all" method does not dictate any particular methodology; it instructs the Commission to employ whatever method "will most nearly approximate the amount which the injured employee would be earning were it not for the injury." N.C. Gen. Stat. § 97-2(5). It is available only where use of the previous four methods "would be unfair." *Id.*

The Commission, ostensibly applying Method 5, determined that Tedder's average weekly wage was $625—effectively treating Tedder as if he was a full-time, permanent employee of A&K. We reject this computation because it squarely conflicts with the

statute's unambiguous command to use a methodology that "will most nearly approximate the amount which the injured employee would be earning were it not for the injury." N.C. Gen. Stat. § 97-2(5). As the Commission found, Tedder would have earned that $625 wage for no more than seven weeks, until his temporary job ended. He would then be unemployed and searching for work, as he was for most of the preceding two years. Indeed, a $625 per week wage so vastly overstates Tedder's actual "average" earnings that, when applying Method 3, the Commission expressly found that a $625 average weekly wage was "unfair" to A&K. Accordingly, we must reverse and remand this case for a new average weekly wage calculation.

We leave it to the Commission on remand to determine the appropriate average weekly wage consistent with the statutory language of Section 97-2(5). However, to assist with that calculation, we provide the following guidance based on existing precedent from our appellate courts.

First, the Supreme Court's decision in *Joyner v. A.J. Carey Oil Co.*, 266 N.C. 519, 146 S.E.2d 447 (1966), is instructive. In *Joyner*, the claimant was a relief truck driver who worked only as needed. *Id.* at 519-20, 146 S.E.2d at 448. The Court described the driver's employment as "inherently part-

time and intermittent." *Id.* at 522, 146 S.E.2d at 450. In calculating the driver's average weekly wage, therefore, the Court held that it was unfair to the employer not to take into consideration both peak and slack periods in the plaintiff's employment. *Id.* Accordingly, the Supreme Court held that the employee's average weekly wages should be calculated under the fifth method by taking the total wages he actually earned in the 52 weeks prior to his injury and dividing that amount by 52, the number of weeks in a year. *Id.*

This Court later applied *Joyner* to cases involving employees who worked only part of the year. *See Conyers*, 188 N.C. App. at 260-61, 654 S.E.2d at 751-52. In *Conyers*, the plaintiff was a bus driver who worked ten months per year. *Id.* at 254, 654 S.E.2d at 747. We held that the fifth method was most appropriate to take into account the slack periods in the plaintiff's employment. *Id.* at 261, 654 S.E.2d at 751. Noting that the purpose of the calculation is to "most nearly approximate the amount which the [bus driver] would be earning were it not for the injury," we held that the plaintiff's average weekly wages should be determined by dividing the wages she earned in the 52 weeks before her accident by 52. *Id.*

Finally, in *Thompson v. STS Holdings, Inc.*, 213 N.C. App. 26, 33, 711 S.E.2d 827, 831 (2011), this Court addressed the average weekly wage calculation for an employee who worked contract jobs for various employers throughout the year. At the time of his injury, the employee had worked a total of 14 days for his current employer. *Id.* at 28, 711 S.E.2d at 828. This Court held that the employee's contract work for other employers during the year could not be considered in calculating his average weekly wages. *Id.* at 33-34, 711 S.E.2d at 831-32. We again held, as we did in *Conyers*, that an employee's average weekly wages under Method 5 should be calculated by taking the "wages earned by [the employee] while in the employ of [the current employer] in a fifty-two week period, then dividing that amount by fifty-two." *Id.* at 33, 711 S.E.2d at 831.

In light of *Joyner*, *Conyers*, and *Thompson*, we hold that in calculating average weekly wages for employees in temporary positions, the Commission must consider the number of weeks the employee would have been employed in that temporary position relative to a 52-week time period. One approach that would satisfy this requirement is to calculate the total amount the employee would have earned in the temporary position and divide that amount by 52. We do not suggest that this is the *only*

appropriate methodology in every case, as the intent of Method 5 is to provide flexibility in reaching a result that "will most nearly approximate the amount which the injured employee would be earning were it not for the injury." N.C. Gen. Stat. § 97-2(5). But in this case, and others with similar facts, we hold that calculating the total amount the employee could expect to earn in the temporary position, and then dividing that amount by 52, is an appropriate means of approximating the amount the injured employee would be earning were it not for the injury.

We are mindful that this methodology, when applied to Tedder, will result in a compensation rate only slightly above the statutory minimum. But treating Tedder as if his "average weekly wages" were $625—in other words, treating Tedder as if he had a history of long-term, full-time employment in his temporary position at A&K—is a financial windfall for Tedder and an unjust result for A&K. This, in turn, violates the guiding principle and primary intent of the statute—obtaining "results that are fair and just to both employer and employee." *Conyers*, 188 N.C. App. at 256, 654 S.E.2d at 748. Accordingly, we reverse and remand this case to the Industrial Commission to recalculate Tedder's average weekly wages consistent with this opinion.

## II.  Determination of Temporary Total Disability

Defendants next argue that the Commission erred by concluding that Tedder is entitled to ongoing temporary total disability payments.  Defendants' argument is straightforward. In 2004, Tedder suffered a compensable back injury.  In 2006, Tedder's treating physician, Dr. Goebel, found that Tedder had reached maximum medical improvement and assigned a permanent "medium-duty" restriction on lifting more than fifty pounds as well as limits on bending, stooping, twisting, squatting, crouching, and prolonged sitting or standing.  Dr. Goebel never lifted that permanent restriction.

After his 2011 injury, Tedder again underwent treatment. His treating physician, Dr. Burke, testified that, as of 9 January 2013, she believed Tedder had shown improvement and that "I think anything up to medium would be fine."  Defendants argue that, because Tedder had medium-duty work restrictions before his 2011 injury, and had returned to medium-duty work capacity as of 9 January 2013, he was no longer disabled under the terms of the Workers' Compensation Act.  For the reasons that follow, we reject this argument and affirm the Commission's finding that Tedder is entitled to ongoing disability payments.

The definition of disability under the Workers' Compensation Act "specifically relates to the incapacity to earn wages, rather than only to physical infirmity." *Medlin v. Weaver Cooke Constr., LLC*, ___ N.C. ___, ___, 760 S.E.2d 732, 736 (2014). In *Medlin*, our Supreme Court reaffirmed the test for establishing disability under the Workers' Compensation Act set out in *Hilliard v. Apex Cabinet Co.*, 305 N.C. 593, 290 S.E.2d 682 (1982). *Hilliard* articulated three factual elements that a plaintiff must prove to support the legal conclusion of disability:

> We are of the opinion that in order to support a conclusion of disability, the Commission must find: (1) that plaintiff was incapable after his injury of earning the same wages he had earned before his injury in the same employment, (2) that plaintiff was incapable after his injury of earning the same wages he had earned before his injury in any other employment, and (3) that this individual's incapacity to earn was caused by plaintiff's injury.

*Id.* at 595, 290 S.E.2d at 683.

Defendants contend that Dr. Burke's testimony proves Tedder was able to return to medium-duty work as of 9 January 2013, the same work level he had before his 2011 injury. Thus, Defendants argue that Tedder's inability to find work was not "caused by"

his 2011 injury because he had the same functional capacity in January 2013 that he had before his injury in 2011.

We agree that the portion of Dr. Burke's testimony on which Defendants rely supports their position. But under the deferential standard of review afforded to decisions of the Industrial Commission, we must affirm if there is "any competent evidence" supporting its findings of fact, even if there is evidence supporting a contrary finding. *See, e.g.*, *Davis v. Harrah's Cherokee Casino*, 362 N.C. 133, 137, 655 S.E.2d 392, 394-95 (2008). Here, although there is evidence supporting Defendants' position, there is at least some competent evidence supporting the Commission's contrary findings.

Dr. Burke's testimony is not a model of clarity. Dr. Burke testified that "I certainly think [Tedder] can do a job. I think anything up to medium would be fine." But she also testified that "I think at this point *I would anticipate* him being able to do medium work." She explained that while she *expects* this to be the case, she had not yet completed a Functional Capacity Evaluation, "so I can't be very specific about exactly what he could lift, carry, stoop, bend, and all those other things at this point." Dr. Burke concluded that "it is my overall feeling of his level of functioning, that [medium-

duty work] is what *he's going to be able to do*." Thus, Dr. Burke did not unequivocally conclude that Tedder was capable, as of 9 January 2013, of performing medium-duty work. Her testimony also could be interpreted as an indication that she *anticipates* he will be capable of medium-duty work in the future as he continues his treatment.

Moreover, in addition to the somewhat ambiguous exchange above, Dr. Burke testified that while Tedder was "close" to achieving maximum medical improvement, he had not yet reached that point. She indicated that Tedder was still experiencing "some numbness and tingling in the left foot," as well as "some tightness over the lumbar spine." Finally, she opined that she did not believe Tedder would be "in the shape [he is] in now" but for the 8 March 2011 injury.

Under the applicable standard of review, this testimony is competent evidence supporting the Commission's finding that Tedder was unable to continue work as a delivery driver because of his back injury. Accordingly, we affirm the Commission's award of temporary total disability compensation.

### Conclusion

For the foregoing reasons, we affirm the Industrial Commission's conclusion that Plaintiff Keith Tedder is entitled

to temporary total disability compensation.  We reverse and remand for a determination of average weekly wages consistent with this opinion.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

Chief Judge McGEE and Judge STEPHENS concur.